J-S42014-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIM ALEXANDER BURGESS JR. | : | |
| | : | |
| Appellant | : | No. 482 MDA 2025 |

Appeal from the PCRA Order Entered March 27, 2025
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0003837-2018

BEFORE:  OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 30, 2026**

Appellant, Kim Alexander Burgess, Jr., appeals from the March 27, 2025 order dismissing his petition filed pursuant of the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  We remand this matter pursuant to **Commonwealth v. Bradley**, 261 A.3d 381 (Pa. 2021) for additional proceedings that will permit the PCRA court to consider the claims of ineffective assistance of PCRA counsel raised by Appellant for the first time on appeal.

The PCRA court set forth the factual and procedural history of this case as follows.

> On October 5, 2017, police found Jeannie Heiser ("victim") deceased in her living room.  An autopsy determined the victim's cause of death was acute fentanyl toxicity.  Through investigation, police learned that Lauren Miller ("Miller") contacted [Appellant] to see if he would sell heroin to the victim.  [Appellant] then sold four or five bags of heroin/fentanyl to the

victim. [Appellant] also gave additional bags of heroin/fentanyl to the victim which the victim then delivered to Miller.

[Appellant] was charged with violation of the controlled substance, drug, device & cosmetic act (delivery of fentanyl to both the victim and Miller), drug delivery resulting in death, criminal use of a communication facility, and criminal conspiracy with Miller[.]

A jury trial commenced on September 23, 2019. Alyssa Stoltzfus ("Stoltzfus") testified that she was the victim's sister, they lived together, her sister occasionally used drugs, and her sister bought the drugs from someone named Elby who was on house arrest. On October 5, 2017, the victim told Stoltzfus that she just used heroin and it was really strong. Later that day, Stoltzfus found the victim lying face down on the floor.

Trooper Jonathan Cox ("Cox") of the Pennsylvania State Police ("PSP") responded to the scene and found the victim deceased in the living room. Dr. Wayne Ross, a forensic pathologist, testified that the victim died of acute fentanyl toxicity. According to a report from National Medical Services Lab, the victim had 2.4 nanograms per milliliter of fentanyl in her blood, which was lethal.

Cox found four empty wax paper baggies or sleeves in the victim's purse that appeared to contain heroin residue. According to PSP Trooper Brian McNally ("McNally"), the four wax paper folds [aka "baggies"] seized from the victim's residence were sent to the PSP laboratory for analysis and it was determined they contained fentanyl.

Cox retrieved the victim's [tele]phone and passcode. Trooper McNally testified that from an external review police saw a number of text messages between the victim and a female listed in contacts as Elby. PSP analysts then determined the [tele]phone number associated with Elby belonged to Lauren Miller, who was on house arrest. McNally obtained [tele]phone records for both Miller and the victim which showed a substantial amount of text messages and [tele]phone calls between the two of them on October 5, 2017. A picture from the victim's [tele]phone which was taken outside of Miller's residence also showed a white wax paper fold stashed underneath the threads of a broom, consistent with the baggies found in the victim's residence.

- 2 -

McNally further stated that Miller's [tele]phone records showed she was in contact with telephone number 717-[***]-[****] on the morning of this incident, while she had very little contact with any other parties. Police obtained [tele]phone records for 717-[***]-[****], and the subscriber came back as Mike Jones [who resided along] King Street in Lancaster[, Pennsylvania]. Police were not able to locate that individual. Police also obtained detail[ed] records showing subscriber information, call logs, text logs, and information detailing which cell[ular tele]phone towers were used [to locate the cellular telephones pertinent to the investigation].

McNally testified that on February 20, 2018, Miller was interviewed by police and she identified [Appellant] as the person responsible for delivering the drugs which caused the victim's death. At trial, Miller acknowledged she was known as Elby and stated she had been addicted to opioids for close to ten years. Miller knew [Appellant] for most of that time because she purchased drugs from him.

Miller stated that the victim called her on October 5, 2017, to buy heroin, and Miller contacted [Appellant] by text and [tele]phone so he could make the delivery. The victim was then to bring some heroin to Miller because Miller was on house arrest for a 2016 charge of delivery of heroin. Miller did not have to pay for the drugs she was going to receive because [Appellant] "owed me some." Miller admitted she coordinated the [tele]phone calls and arranged the deal because the victim did not know [Appellant]. Miller provided the victim and [Appellant] with a description of each other and told the victim where to meet [Appellant] in downtown Lancaster.

Miller testified that the victim texted her from outside Miller's house after the drug delivery was completed indicating the victim was leaving the drugs near a broom on the porch. Miller then retrieved four small bags of drugs from outside. Within the next few days, [Appellant] traveled to Miller's house to deliver more heroin directly to her, at which time Miller told [Appellant] that the victim had died[.]

Miller acknowledged she was not honest when she met with McNally on October 5, 2017, because [Appellant] was her friend and her drug dealer. Miller was also not truthful the second time they met. However, Miller stated she was truthful when

- 3 -

they met in February of 2018 after she was arrested and stopped using drugs.

Miller informed McNally that [Appellant] had a girlfriend named Jennifer Simmons ("Simmons"). McNally then located an address for Simmons and went to her residence. Simmons was not there, but her mother Mary Jo Russin ("Russin") was. Russin testified at trial that she knew [Appellant] since 2014 because he dated her daughter. [Appellant] lived with Russin from May through Labor Day of 2017. In August or September of 2017, Russin suspected that [Appellant] had a burner [tele]phone. When she searched the room [Appellant] shared with Simmons, Russin found a receipt inside a Metro PCS box with the name of Mike Jones. Russin called the number on the receipt . . . and [Appellant] answered the [tele]phone.

McNally testified that subsequent investigation determined an individual by the name of Stephanie Custer ("Custer") called the [tele]phone number belonging to "Mike Jones" more than 150 times from the beginning of September to the middle of November. Custer was located in SCI Cambridge Springs and was later interviewed by police.

Custer testified she bought heroin from [Appellant] for a few years, including from the middle of 2017 through late that year. Custer would text [Appellant] to get heroin and [Appellant] would ask how much she wanted. When told there were 139 contacts from September 26, 2017, through October 14, 2017, between her [tele]phone and the [tele]phone number associated with [Appellant], Custer was surprised the number was not higher because the contacts were "constant." After [Appellant] was placed on house arrest following the victim's death, he continued to sell heroin to Custer out of his bedroom window. In early 2018, [Appellant] told Custer to be really careful because it was really strong, and Custer overdosed twice in less than one week on heroin she got from [Appellant].

Detective Stephen Owens ("Owens") testified as an expert in the field of cellular records, cellular records analysis, digital forensics, and tower location data. Owens reviewed an extract from the victim's cell[ular tele]phone which contained contacts, text messages and pictures. Owens reviewed call detail records for the [tele]phones of Miller and the victim which were obtained from [tele]phone companies. Owens also reviewed call detail records from T-Mobile for [tele]phone number

717-[***]-[****], which provided a subscriber name of Mike Jones and an effective date of August 20, 2017. Metro PCS is the prepaid arm of T-Mobile.

Owens stated that tower location data established the victim's cell[ular tele]phone was located in Lancaster City on October 5, 2017, at 10:48 a.m., near the area where Miller stated she arranged for the victim and [Appellant] to meet for the drug deal. The cell[ular tele]phone belonging to [Appellant]/Mike Jones was also located in Lancaster City at 10:45 a.m., in the area of the drug transaction. The two [tele]phones were generally in the same area between 10:45 a.m. and 10:48 a.m., while Miller's cell[ular tele]phone was at her residence.

Owens noted there was a call from Miller's [tele]phone to the [tele]phone of Mike Jones/[(Appellant)] at 10:45 a.m., which was consistent with Miller's testimony that she was trying to coordinate the meeting between [Appellant] and the victim. At the time of the call, Miller's [tele]phone was utilizing the tower by her residence. On October 6, 2017, the day after the [victim's] overdose, the [tele]phone belonging to Mike Jones/[Appellant] was located at the tower near Miller's residence.

Owens found photographs on the victim's [tele]phone, taken from Miller's residence on October 5, 2017, at 12:35 p.m., which showed [glassine heroin baggies]. Owens then found a text between Miller and the victim at 12:37 p.m. stating, "'you're the best, I owe you big-time.'" Police and EMS were dispatched to the victim's residence for cardiac arrest at 3:24 p.m.

Owens stated that while he was testifying about the suspect's tele]phone and not [Appellant], he compiled a list of the most frequently called numbers to identify those individuals who could associate the [tele]phone with a specific person. … According to Owens, the records were consistent with and corroborated the witness testimony that [Appellant] utilized [tele]phone number 717-[***]-[****].

On September 26, 2019, following a three-day jury trial, [Appellant] was found guilty on all counts. A pre-sentence investigation report ("PSI") was ordered.

On January 2, 2020, the court imposed . . . [an] aggregate sentence [of] 23½ to 62 years' incarceration. [Appellant] filed

a motion to modify sentence on January 10, 2020. The court denied [Appellant]'s motion on January 24, 2020. [This Court affirmed Appellant's judgment of sentence on April 7, 2021. *See Commonwealth v. Burgess*, 253 A.3d 260 (Pa. Super. 2021) (non-precedential decision).]

\*\*\*

On November 30, 2021, [Appellant] filed his first, *pro se* PCRA petition, and on December 20, 2021, PCRA counsel was appointed. On February 28, 2022, appointed counsel was granted leave to withdraw as counsel as [Appellant] had retained private counsel, Jack McMahon, Esquire.

\*\*\*

On January 2, 2023, [Attorney McMahon] filed a supplemental PCRA petition, incorporating [Appellant's] *pro se* claims. The *pro se* and supplemental claims, respectively, are as follows:

> 1. Trial counsel was ineffective, and [Appellant] was denied due process of law, when trial counsel failed to withdraw as counsel due to an actual conflict of interest.
>
> 2. Trial counsel was ineffective by failing to object or move to have the Commonwealth's witnesses sequestered.
>
> 3. Trial counsel was ineffective in failing to object to the Commonwealth's repeated use of graphic photos of the decedent and trial counsel failed to object to prejudicial comments made during closing arguments.
>
> 4. The Commonwealth invaded the providence of the jury when it presented cell[ular tele]phone records of "Mike Jones" as belonging to [Appellant].
>
> 5. Trial counsel rendered ineffective assistance of counsel by failing to investigate and utilize the cell[ular tele]phone records of "Mike Jones," Lauren Miller, and/or Jeannie Heiser to effectively cross-examine and/or impeach key Commonwealth witnesses.

6. Trial counsel was ineffective by failing to object to the addition of a new charge added by the Commonwealth after trial had commenced.

7. Trial counsel was ineffective by failing to subpoena state parole officers of two Commonwealth witnesses in order to impeach their testimony and credibility.

8. Trial counsel was ineffective in failing to properly impeach and cross-examine Commonwealth witness Coroner Wayne Ross.

9. The [trial c]ourt erred and [Appellant] was denied due process of law when the court allowed unlawfully obtained [tele]phone records of "Mike Jones" to be introduced during trial, which resulted in the introduction of witnesses for which the defense was unable to properly prepare, and the court allowed the jury to review expert witness Stephen Owens's exhibits during deliberations.

10. Trial counsel was ineffective [accepting the trial court's ambiguous responses to proposed jury questions and for failing to request more concise and definite trial court responses].

11. [Appellant's] due process rights were violated when the Commonwealth used hearsay testimony during his preliminary hearing to prove a prima facie case.

12. Trial and appellate counsel were ineffective for failing to challenge the discretionary aspects of sentencing.

13. Trial counsel was ineffective for failure to object to the substantive charge of conspiracy being added right before trial.

14. [Appellant's] due process rights were violated when the Commonwealth used hearsay testimony from Trooper McNally during [Appellant's] preliminary hearing to prove a *prima facie* case based on **Commonwealth v. McClelland**, 233 A.3d 717 (Pa. 2020).

15. Trial counsel was ineffective for failing to litigate the suppression of MetroPCS telephone records based on *Carpenter v. United States*, 819 F.3d 880 (2018).

\*\*\*

Thereafter, on September 18, 2023, February 20, 2024, May 9, 2024, [Appellant] filed *pro se* Motions to Stay Proceedings on the PCRA petition due to a lack of communication between himself and [Attorney McMahon]; [the PCRA court] honored those requests. On June 26, 2024, [Appellant] filed a second *pro se* PCRA petition.  As [Appellant] was represented by [Attorney McMahon, the PCRA court] could not consider a new *pro se* PCRA petition as it would be considered hybrid representation. *See Commonwealth v. Green*, 271 A.3d 393, 409 n.8 (Pa. Super. 2021) ("We note that "[i]n this Commonwealth, hybrid representation is not permitted.") (citation omitted). In response, this court ordered a *Grazier*[1] hearing to determine if [Appellant] wished to continue with [Attorney McMahon's] assistance or to proceed *pro se*; during said hearing [Appellant] unequivocally confirmed he would not pursue self-representation.

PCRA Court's 907 Notice, 3/17/25, at 1-10 (formatting altered, footnotes and most internal citations omitted, footnote added).  Ultimately, on March 17, 2025, the PCRA court issued notice pursuant to Pa.R.Crim.Pro 907 of its intent to dismiss Appellant's petition without conducting a hearing.  Appellant, by way of Attorney McMahon, filed a response on March 25, 2025.  Nonetheless, on March 27, 2025, the PCRA court entered an order dismissing Appellant's PCRA petition.

On April 8, 2025, Attorney McMahon filed a notice of appeal on Appellant's behalf.  The PCRA court issued an order on April 9, 2025, directing

---

[1] *See Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998).

Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) within 21 days. On April 30, 2025, Appellant, by way of Attorney McMahon, submitted a 1925(b) concise statement raising the following claims:

1. The [PCRA c]ourt erred in denying [Appellant's] PCRA petition.

2. Counsel was ineffective for failing to object to adding the substantive charge of conspiracy right before trial.

3. Trial counsel and appellate counsel were ineffective for failing to raise the complete hearsay nature of the preliminary hearing pursuant to **McClelland**, [**supra**].

4. Counsel was ineffective for [failing] to litigate [a] suppression motion based on the [United States'] Supreme Court ruling in **Carpenter**[, **supra**].

5. Counsel was ineffective for not litigating pre-trial that [the trial c]ourt['s] order [was] not sufficient to [. . .]

Appellant's Rule 1925(b) Concise Statement, 4/30/25, at 1. Subsequently, however, Appellant retained new counsel, Todd Mosser, Esquire. **See** Entry of Appearance, 5/13/25, at 1. Attorney Mosser currently represents Appellant on appeal.

Appellant now raises the following issues for our consideration:

1. Was PCRA counsel ineffective for failing to properly raise and preserve [Appellant's] after[-]discovered [evidence] claim of the Commonwealth's violation of **Napue v. Illinois**[, 360 U.S. 264 (1959)] and **Giglio v. United States**, 405 U.S. 150 (1972)?

2. Was PCRA counsel ineffective for failing to allege that trial counsel was ineffective for failing to object or move for a mistrial after the prosecutor told the jury during closing arguments that the jury speaks for the victim, that defense

- 9 -

counsel like[d] drug dealers, and that he had obtained convictions in other cases based on the same quality of evidence that was present in the instant case?

Appellant's Brief at 2-3.

On appeal, Appellant argues that Attorney McMahon provided ineffective assistance as collateral relief counsel. Initially, Appellant claims that, at his trial, Miller "affirmatively testified that she was not promised anything and was expecting no favorable treatment from the Commonwealth" in exchange for her testimony at Appellant's trial. Appellant's Brief at 15; *see also* N.T. Trial, 9/24/19, at 254-255. Appellant also claims that Miller's credibility was bolstered by the Commonwealth in closing arguments, in which the prosecutor stated: "[Miller's] day will come. She's been promised nothing, given nothing. Her day of reckoning is on the horizon." *See id.* N.T. Trial, 9/25/19, at 504-505; *see also* Appellant's Brief at 15. Contrary to the above, however, Appellant claims to have discovered evidence that Miller and the Commonwealth agreed, in some capacity, to give her leniency in exchange for her testimony at Appellant's trial *See id.* at 15-16 (citing to testimony during Miller's sentencing hearing on March 9, 2020, revealing a potential agreement between the Commonwealth and Miller). Because the failure to disclose such an agreement may violate a defendant's due process rights under *Napue* and *Giglio*, Appellant claims that Attorney McMahon was ineffective for failing to raise a claim on this basis during the proceedings before the PCRA court. *See Giglio*, 405 U.S. at 154 (holding that the fact that the lead witness entered into an agreement to avoid prosecution in exchange for testifying at the

defendant's trial was important for the jury to know because it was relevant to the witnesses' credibility. As such, the government's failure to disclose to the defense evidence of such an agreement violated the defendant's due process rights); *see also Napue*, *supra* (holding that the prosecution's failure to correct an important witness's false testimony that he did not receive any promises or consideration in return for his testimony violated the defendant's due process rights). In addition, Appellant claims that Attorney McMahon failed to challenge certain statements made by the Commonwealth during closing arguments which, in Appellant's view, "far exceeded the bounds of proper argument." Appellant's Brief at 20. Accordingly, Appellant argues that Attorney McMahon's failures constituted ineffective assistance as collateral relief counsel. Importantly, Appellant did not challenge Attorney McMahon's competence in his PCRA petition, his response to the PCRA court's notice of intent to dismiss pursuant to Pa.R.Crim.P. 907, or his Rule 1925(b) statement, as Attorney McMahon still represented Appellant at that time. Instead, Appellant, through newly-retained counsel, raises these claims for the alleged ineffectiveness of his original collateral relief counsel for the first time on appeal.

Recently, our Supreme Court in *Bradley*, *supra*, held that "after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, [a petitioner may] raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal." *Bradley*, 261 A.3d at 401 (footnote omitted). The *Bradley* Court recognized that "a petitioner has a rule-based

right to the appointment of counsel for a first PCRA petition" and, with that right, he is "entitled to the effective assistance of counsel." *Id.* at 391-392 (stating, "[t]he guidance and representation of an attorney during collateral review ensures that meritorious legal issues are recognized and addressed, and that meritless claims are abandoned"). In balancing a petitioner's right to effective assistance of counsel and society's interest in the efficient and final conclusion of criminal matters, our Supreme Court held that permitting "a petitioner to raise claims of PCRA counsel's ineffectiveness at the first opportunity when represented by new counsel, even if on appeal, while not an ideal solution, accommodates these vital interests." *Id.* at 401. The *Bradley* Court further stated that a claim of PCRA counsel ineffectiveness raised for the first time on collateral appeal did not violate the PCRA one-year jurisdictional time-bar because such a claim of PCRA counsel ineffectiveness "sprang" from the original, timely PCRA petition and did not constitute a second or subsequent petition. *Id.* at 402, 404 (rejecting "the notion that considering ineffectiveness claims on collateral appeal constitutes a prohibited serial petition, violating the PCRA's one-year [jurisdictional] time bar." (footnote omitted)). "In some instances, the record before the appellate court will be sufficient to allow for disposition of any newly-raised ineffectiveness claims[; h]owever, in other cases, the appellate court may need to remand to the PCRA court for further development of the record and for the PCRA court to consider such claims as an initial matter." *Id.* at 402 (citations omitted). "Where there are material facts at issue concerning claims challenging

counsel's stewardship and relief is not plainly unavailable as a matter of law, the remand should be afforded[.]" ***Id.*** (citations, quotations, and original brackets omitted).

Under ***Bradley***, Appellant's current claims are properly before this Court as this is Appellant's first opportunity to challenge Attorney McMahon's stewardship. Appellant has come forward, within the context of a timely first petition for collateral relief, with a colorable basis to support his claims. Initially, Appellant produced evidence, *i.e.*, Miller's sentencing hearing transcripts, which appear to reveal a possible agreement between Miller and the Commonwealth for leniency with respect to her criminal charges in exchange for her testimony at Appellant's trial, even though Miller testified, and the Commonwealth attorney stated, that no such agreement existed. ***See*** Appellant's Brief at 13-17; ***see also*** N.T. Trial, 9/24/19, at 254-255; N.T. Trial, 9/25/19, at 504-505. Given the fact that Miller served as the key witness involved in the delivery of fentanyl to the victim, as well as precedent promulgated by the United States Supreme Court and the Pennsylvania Supreme Court, such a claim bears upon Appellant's due process rights and Appellant may have been prejudiced by Attorney McMahon's failure to raise this claim. ***See Giglio***, ***supra***; ***Napue***, ***supra***, ***see also Commonwealth. v. Strong***, 761 A.2d 1167 (Pa. 2000) (holding that the appellant established a due process violation because the Commonwealth failed to disclose evidence of a tacit agreement with a key witness to obtain favorable treatment in a subsequent prosecution for the same crime in exchange for the witness's

testimony). In this same vein, Appellant points to various statements made by the Commonwealth during closing arguments at trial which trial counsel and, in turn, Attorney McMahon, failed to challenge.[2] We conclude that, at a minimum, Appellant has identified genuine issues of fact which, if resolved in his favor, could potentially support a viable claim of ineffective assistance of counsel, as well as a layered claim of ineffective assistance of counsel. Therefore, pursuant to **Bradley**, these contentions should be explored further by the PCRA court. Hence, we vacate the order dismissing Appellant's petition and remand this matter for further proceedings aimed at assessing whether Attorney McMahon was ineffective and, if so, whether his performance deprived Appellant of a right to collateral relief.

Order vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 01/30/2026

_____

[2] In the PCRA petition filed on Appellant's behalf by Attorney McMahon, he challenged different statements the Commonwealth made during closing arguments. *See* PCRA Petition, 6/26/24, at 17-18. The PCRA court, therefore, did not address Appellant's current claim. *See* PCRA Court's 907 Notice, 3/17/25, at 18-21.