RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0126p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 14-1572

TIMOTHY IVORY CARPENTER,

*Defendant-Appellant*.

───────────────

On Remand from the United States Supreme Court.

United States District Court for the Eastern District of Michigan at Detroit.
No. 2:12-cr-20218-4—Sean F. Cox, District Judge.

Decided and Filed:  June 11, 2019

Before:  GUY, KETHLEDGE, and STRANCH, Circuit Judges.

───────────────

## OPINION

───────────────

JANE B. STRANCH, Circuit Judge.  This case returns on remand from the Supreme Court.  In our prior opinion, the majority held that the Government's warrantless collection of Timothy Ivory Carpenter's cell-site location information (CSLI) did not violate the Fourth Amendment.  The Supreme Court disagreed.  The unconstitutionality of the Government's search was not clear until after the Supreme Court reversed our decision, which leads us to the question of whether the FBI agents who obtained Carpenter's CSLI acted in good faith.  Because these agents reasonably relied on the Stored Communications Act (SCA), we **AFFIRM** the judgment of the district court.

# I. BACKGROUND

## A. CSLI and the SCA

We begin with the basics of CSLI and the related legal framework. CSLI refers to the time-stamped location records generated each time a wireless device communicates with a carrier's network by connecting to the nearest antenna, known as a "cell site." *Carpenter v. United States* (*Carpenter II*), 138 S. Ct. 2206, 2211 (2018). As cell phone usage has become ubiquitous, cell sites have proliferated. *Id.* Each new cell site, in turn, enhances the precision of cell phone owners' CSLI. Even in the time elapsed between Carpenter's trial and the Supreme Court's decision in *Carpenter II*, CSLI had "rapidly approach[ed] GPS-level precision." *Id.* at 2219; *see also id.* ("[W]ith new technology measuring the time and angle of signals hitting their towers, wireless carriers already have the capability to pinpoint a phone's location within 50 meters.").

The imminent launch of fifth-generation wireless technology, known as 5G, promises to multiply the number of cell sites in this country. Wireless networks once designed to carry cell phone traffic will soon support an unprecedented number of devices connected across industries, including autonomous vehicles, smart homes, wearable devices, industrial machinery, and drones. *See* Jill C. Gallagher & Michael E. DeVine, Cong. Research Serv., R45485, *Fifth-Generation (5G) Telecommunications Technologies: Issues for Congress* 2–6 (2019). To handle all the wireless data transmitted by these new technologies, carriers must greatly increase the number of cell sites nationwide. Verizon, for example, recently estimated that upgrading the nation's wireless infrastructure to prepare for 5G will require "100 times more antenna locations than currently exist," and AT&T projected "that providers will deploy hundreds of thousands of wireless facilities in the next few years alone—equal to or more than the number providers have deployed in total over the last few decades." *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, F.C.C. No. 18-133, 2018 WL 4678555, at *17 (Sept. 27, 2018).

Against the backdrop of this new era of connected devices, § 2703(d) of the SCA—a provision first drafted 25 years ago—permits law enforcement to obtain certain records of a

person's wireless communications whenever the government "offers specific and articulable facts showing that there are reasonable grounds to believe" the records sought "are relevant and material to an ongoing criminal investigation." *See* Communications Assistance for Law Enforcement Act, Pub. L. No. 103-414, 108 Stat. 4279, 4292 (1994). Unlike other provisions of the SCA, the court-ordered production mechanism in § 2703(d) does not require law enforcement to get a warrant before acquiring these records. *Compare* 18 U.S.C. § 2703(d) *with id.* § 2703(a), (c)(1)(A). In this case, the Government collected Carpenter's CSLI under § 2703(d); it did not obtain a warrant.

## B. Factual and Procedural History

Because we and the Supreme Court summarized the facts of this case in prior decisions, *see Carpenter II*, 138 S. Ct. at 2211–13; *United States v. Carpenter* (*Carpenter I*), 819 F.3d 880, 884–85 (6th Cir. 2016), we focus on the information most relevant to the analysis on remand. First, a housekeeping matter: *Carpenter I* addressed the consolidated appeals of both Carpenter and a codefendant, Timothy Michael Sanders, *see* 819 F.3d at 884, but only Carpenter sought Supreme Court review. Carpenter limited his petition for certiorari to the question of whether the Fourth Amendment permits the warrantless acquisition of CSLI, *see* Petition for Writ of Certiorari, *Carpenter II*, 138 S. Ct. 2206 (No. 16-402), and did not include the other grounds for appeal that he raised (and we rejected) in *Carpenter I*, *see* 819 F.3d at 890–93. We adopt *Carpenter I*'s treatment of those issues not considered in *Carpenter II*. Our task here is only to apply the Supreme Court's Fourth Amendment analysis to Carpenter's case.

A federal jury convicted Carpenter of robbery and gun charges after he and others committed a string of robberies in Michigan and Ohio between 2010 and 2012. During its investigation, the Government sought court orders under § 2703(d) for Carpenter's CSLI. In response to the Government's applications, two magistrate judges ordered Carpenter's wireless carriers to provide "the locations of cell/site sector (physical addresses) for the target telephones at call origination and at call termination for incoming and outgoing calls." *Carpenter II* described the scope of the CSLI turned over by Carpenter's carriers:

The first order sought 152 days of cell-site records from MetroPCS, which produced records spanning 127 days. The second order requested seven days of CSLI from Sprint, which produced two days of records covering the period when Carpenter's phone was "roaming" in northeastern Ohio. Altogether the Government obtained 12,898 location points cataloging Carpenter's movements—an average of 101 data points per day.

138 S. Ct. at 2212. Carpenter joined Sanders's motion in limine to suppress the cell phone data, which the district court denied.

At trial, the Government used Carpenter's CSLI to create a record of his physical proximity to many of the alleged robberies:

With the cell-site data provided by Carpenter's and Sanders's wireless carriers, [FBI agent Christopher] Hess created maps showing that Carpenter's and Sanders's phones were within a half-mile to two miles of the location of each of the robberies around the time the robberies happened. Hess used MetroPCS call-detail records, for example, to show that Carpenter was within that proximity of a Detroit Radio Shack that was robbed around 10:35 a.m. on December 13, 2010. Specifically, MetroPCS records showed that at 10:24 a.m. Carpenter's phone received a call that lasted about four minutes. At the start and end of the call, Carpenter's phone drew its signal from MetroPCS tower 173, sectors 1 and 2, located southwest of the store and whose signals point north-northeast. After the robbery, Carpenter placed an eight-minute call originating at tower 145, sector 3, located northeast of the store, its signal pointing southwest; when the call ended, Carpenter's phone was receiving its signal from tower 164, sector 1, alongside Interstate 94, north of the Radio Shack. Hess provided similar analysis concerning the locations of Carpenter's and Sanders's phones at the time of a December 18, 2010 robbery in Detroit; a March 4, 2011 robbery in Warren, Ohio; and an April 5, 2011 robbery in Detroit.

*Carpenter I*, 819 F.3d at 885. The Government emphasized the importance of Carpenter's CSLI during its closing argument, saying: "Then there's another overlay of corroboration and that is the phone data tracking. Little Tim[othy Carpenter]'s phone just happened to be right where the first robbery was at the exact time of the robbery, the exact sector."

A jury convicted Carpenter of Hobbs Act robbery and related gun charges in violation of 18 U.S.C. §§ 924(c) and 1951(a). The district court sentenced him to more than 100 years in prison, and he appealed. We affirmed in a divided opinion, with the majority rejecting Carpenter's claim that the Government's collection of his CSLI was a warrantless search in

violation of the Fourth Amendment.  Carpenter filed a petition for certiorari, which the Supreme Court granted.

### C.  *Carpenter II*

*Carpenter II* begins by situating the Government's acquisition of Carpenter's CSLI at "the intersection of two lines" of Fourth Amendment precedent.  138 S. Ct. at 2214–15.  The first line "addresses a person's expectation of privacy in his physical location and movements," while the second holds that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *See id.* at 2215–16 (citation omitted); *see also Carpenter I*, 819 F.3d at 895 (Stranch, J., concurring in the judgment).

As for the first line of precedent, *Carpenter II* explained that "when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user."  138 S. Ct. at 2218.  Key to the Court's reasoning was the inability of CSLI to distinguish between public and private life: because a cell phone "faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," any collection of CSLI risks opening "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"  *Id.* at 2217 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). The Court found that Carpenter had a "reasonable expectation of privacy in the whole of his physical movements" as recorded by his CSLI.  *Id.* at 2219.

Under the second line of cases, the Court held that the third-party doctrine did not shield the Government's collection of CSLI from Fourth Amendment safeguards.  That doctrine originated decades ago, when "few could have imagined a society in which a phone goes wherever its owner goes[.]"  *Id.* at 2217.  Nor could prior courts have anticipated the "depth, breadth, and comprehensive reach" of the CSLI used by law enforcement today.  *Id.* at 2223. Because cell phone owners do not, in any "meaningful sense," choose to turn over such a thorough record of their public and private lives, the Court found that the acquisition of

Carpenter's CSLI was a Fourth Amendment search regardless of whether the Government obtained the data from a third party. *Id.* at 2220.

With the Supreme Court's guidance in mind, we reevaluate whether the district court properly permitted the Government to introduce Carpenter's CSLI at trial.

## II. ANALYSIS

"When reviewing the denial of a motion to suppress, we will set aside the district court's factual findings only if they are clearly erroneous, but will review de novo the court's conclusions of law." *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015). The Supreme Court's decision in *Carpenter II* leaves no doubt that the Government's collection of Carpenter's CSLI was a search under the Fourth Amendment. The Government needed a warrant to obtain that information, and the district court erred in concluding otherwise. As *Carpenter II* explained: "Before compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one—get a warrant." 138 S. Ct. at 2221.

Although the Government should have obtained a warrant in this case, we may nevertheless affirm the district court's decision if the Government acquired Carpenter's CSLI in good faith reliance on the SCA. "Though evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). In *Illinois v. Krull*, the Court extended *Leon*'s good faith exception to evidence obtained in reasonable reliance on a statute that is later declared unconstitutional, reasoning "that the greatest deterrent to the enactment of unconstitutional statutes by a legislature is the power of the courts to invalidate such statutes." 480 U.S. 340, 352 (1987); *see also id.* at 349 ("The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant.").

That *Carpenter II* did not invalidate § 2703(d) whole cloth does not meaningfully distinguish this case from *Krull*. What matters is whether it was objectively reasonable for the officers to rely on the statute at the time of the search. *See id.* Here, it was not unreasonable for the FBI agents who acquired Carpenter's CSLI to rely on § 2703(d). The SCA contemplates the Fourth Amendment's protections by specifying some instances where warrants *are* necessary, *see* 18 U.S.C. § 2703(a), (c)(1)(A), so one can understand why the agents might have believed—wrongly, it turns out—that a warrant was not required to obtain CSLI under § 2703(d). And it was not just these officers who believed that § 2703(d) empowered the Government to acquire CSLI without a warrant. Two magistrate judges issued court orders granting the Government's request to compel the production of Carpenter's CSLI. At the time these requests were granted, this circuit had already considered reliance on § 2703(d) to be reasonable. *See United States v. Warshak*, 631 F.3d 266, 288–89 (6th Cir. 2010) (finding that government agents relied on § 2703(d) in good faith when compelling a defendant's internet service provider to produce the defendant's emails).[1] And despite Carpenter's arguments to the contrary, nothing in the record suggests that the FBI agents who obtained his CSLI engaged in intentional misconduct.

*Carpenter II* confirmed that the SCA does not immunize a government officer's collection of CSLI from the safeguards of the Fourth Amendment. Moving forward, traditional Fourth Amendment principles will replace reflexive or mechanical use of § 2703(d). The government must either get a warrant or rely on a recognized exception to the warrant requirement.

### III. CONCLUSION

*Carpenter II* teaches that, to avoid "embarrass[ing] the future," courts must carefully and incrementally adapt their Fourth Amendment jurisprudence to advancements in the digital era. 138 S. Ct. at 2220 (citation omitted). The Government's acquisition of Carpenter's CSLI violated the Fourth Amendment. The district court nevertheless properly denied suppression

---

[1]Although *Warshak* announced a prospective rule barring the warrantless search of a suspect's private emails under § 2703(d), the court did not address any other circumstances where reliance on § 2703(d) might be unreasonable. The decision in *Warshak* therefore would not have alerted the agents in Carpenter's case to the unconstitutionality of seeking the CSLI at issue here.

because the FBI agents relied in good faith on the SCA when they obtained the data.  We therefore **AFFIRM**.