*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ARCELL WILLIAM CARTER,

        Defendant-Appellant.

UNPUBLISHED
July 30, 2019

No. 338764
Oakland Circuit Court
LC No. 2016-259659-FC

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), felon in possession of a firearm, MCL 750.224f, and two counts of possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to serve terms of imprisonment of life for the murder conviction, 4 to 10 years for the felon-in-possession conviction, and two years for each felony-firearm conviction, the latter two sentences to run concurrently with each other but consecutive to the sentences for their respective underlying felonies. We affirm.

## I. FACTS

Defendant's convictions arise from the May 17, 2016 shooting death of Trumaine Walker in Pontiac. The prosecution's principal witness testified that defendant and an accomplice approached him and the victim while displaying, respectively, an assault rifle and a handgun. The witness described defendant as a young black male of light complexion, clean-shaven, and wearing no face covering, and described the other assailant as a tall black male wearing perhaps a ski mask. According to the witness, defendant forced the victim inside his house briefly, while the other assailant detained the witness at gunpoint outside until a neighbor appeared and started asking questions. The victim then ran from the house with defendant in pursuit, and defendant shot the victim several times.

Other eyewitnesses described the shooter as a young black male of average height, and one reported that a suspect hurriedly entered the passenger side of a car that then drove away.

The police never determined the identities of the second armed assailant or the getaway driver. Eyewitnesses described the car involved in the shooting as light-colored and compact, which surveillance video confirmed, and also bearing an unfamiliar looking license plate. One witness suggested that the car looked fairly new, which, along with the unusual license plate, suggested it was a rental car.

The morning after the shooting, the police, acting on an anonymous tip suggesting that the car involved in the shooting was parked nearby, located a silver compact car with a Louisiana license plate parked in a driveway. The police watched the car until defendant and his girlfriend entered it and started driving, upon which the police forced defendant to stop in the middle of the street and, with guns drawn, immediately arrested defendant on suspicion of murder. A routine check of the Law Enforcement Information Network later revealed that there was an outstanding arrest warrant for defendant from New Orleans, for crimes involving controlled substances and firearms. The police executed search warrants of defendant's rental car, and also the house where he was staying. The search of the car turned up a bullet cartridge from a cup holder, and a rifle's ammunition magazine about half filled with bullets from the trunk. In the house, the police discovered an assault rifle of the type that left spent casings at the scene of the shooting, and a magazine drum for it that was about half filled with bullets.

The prosecution also presented an expert who testified that records from the provider of defendant's cell phone service indicated that calls involving defendant's phone, at the times relevant, were transmitted by way of utility towers located between defendant's place of residence and the location of the shooting.

## II. TRAFFIC STOP AND ARREST

Defendant argues that the police did not have legally-sound bases for stopping and immediately arresting him as he drove his rental car the morning after the shooting, and thus that all evidence obtained as the result should have been suppressed at trial. Defendant additionally argues that defense counsel was ineffective for having decided to forgo his motion for suppression in the first instance.

The decision whether to admit evidence is within the trial court's discretion and is reviewed on appeal for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "[I]t is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Id.* However, forfeited claims of evidentiary error are reviewed for plain error affecting substantial rights. See *People v Pesquera*, 244 Mich App 305, 316; 625 NW2d 407 (2001); *People v Coy*, 243 Mich App 283, 287; 620 NW2d 888 (2000).

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's factual findings are reviewed for clear error, but questions of constitutional law are reviewed de novo. *Id.* "In reviewing a defendant's claim of ineffective assistance of counsel, the reviewing court is to determine (1) whether counsel's performance was objectively unreasonable and (2) whether the defendant was prejudiced by counsel's defective performance." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Regarding the latter, the defendant must show that the result of the proceeding was fundamentally unfair or unreliable,

and that but for counsel's poor performance the result would have been different. *People v Messenger*, 221 Mich App 171, 181; 561 NW2d 463 (1997).

Before trial in this case, at an April 12, 2017 hearing, defense counsel expressed the intention to seek suppression of the evidence the police obtained as the result of defendant's warrantless arrest, on the ground that the police lacked probable cause. The next day, at a separate motion hearing, counsel abandoned the motion upon learning that the police discovered the outstanding arrest warrant for defendant. The trial court acknowledged counsel's change of position, but nevertheless stated for the record that it thought the police had probable cause to arrest defendant, and alternatively, that the preexisting arrest warrant removed any taint from the allegedly improper arrest in connection with the searches that followed. The issue was not revisited through the course of trial, but this Court remanded this case to the trial court for an evidentiary hearing to determine whether defendant's trial attorney's performance was deficient for having declined to persist with the suppression motion.[1]

The testimony at the evidentiary hearing confirmed the police officers' reasoning for acting on the anonymous tip in relation to a parked car the morning after the shooting, that they saw that defendant matched the description of one of the two men at the murder scene the night before, and also brought to light that defendant had no driver's license when he was arrested. The testimony from police witnesses included that, had they initially confined themselves to conducting an investigative *Terry*[2] stop of defendant when he was driving his rental vehicle, routine procedures would have immediately brought to light not only that defendant had an outstanding arrest warrant, but also that he lacked a driver's license, either of which would have independently occasioned arresting defendant, impounding his car, and conducting an inventory search of the latter. The police further indicated that surrendering the car to defendant's passenger was not an option, according to policy, because she was not authorized to drive it under the terms of the rental agreement.

After taking evidence and receiving briefs, the trial court concluded that defense counsel was not ineffective because the court would have decided against suppression "even if a formal motion would have been filed," and the court stated that it "stands by the original ruling" that the police properly arrested defendant on probable cause. The court alternatively held as follows:

> At the evidentiary hearing, even if there was not a basis to arrest the defendant for the murder at the time, he did not have a driver's license, he had an outstanding felony warrant. The officer testified at the hearing that had he not arrested him for this particular crime, then he would have run his ID, he would have found the warrant, he would have arrested him for that.

---

[1] *People v Carter*, unpublished order of the Court of Appeals, entered February 28, 2018 (Docket No. 338764).

[2] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

He also testified that . . . the woman driving with this defendant at that time, it was a rented vehicle, was not on the rental agreement, did not have authority to drive the vehicle and he would not have left it there parked in the street. He would have impounded and that was the policy of the department at the time.

So, . . . due to an inventory search that inevitably would have happened, the bullet and the other evidence linking this defendant and this car to the crime would have been found in any event. So, there was a basis to arrest this defendant for driving without a license, there was a basis to arrest this defendant. The officer testified he would have run the ID and found the outstanding warrant. He would have been arrested based on that and then, the vehicle would have been impounded and all the evidence would have been found.

So that would have been the ruling even if a formal motion would have been filed . . . . So this Court stands by the original ruling. It would have made the same ruling; therefore, I don't find that [defense counsel] was ineffective and I don't find a basis for a new trial. . . .

## A. PROBABLE CAUSE

The Fourth Amendment of the United States Constitution guarantees the right against being subjected to unreasonable searches and seizures.[3] Evidence obtained in the course of a violation of a suspect's rights under the Fourth Amendment is subject to suppression at trial. *People v Cartwright*, 454 Mich 550, 557-558; 563 NW2d 208 (1997). "[T]he exclusionary rule prohibits the introduction into evidence of materials and testimony that are the products or indirect results of an illegal search, the so-called 'fruit of the poisonous tree' doctrine." *People v Stevens*, 460 Mich 626, 633-634; 597 NW2d 53 (1999), citing *Wong Sun v United States*, 371 US 471, 487-488; 83 S Ct 407; 9 L Ed 2d 441 (1963). However, suppression is not required in connection with "otherwise tainted evidence that ultimately would have been obtained in a constitutionally accepted manner," *People v Brzezinski*, 243 Mich App 431, 436; 622 NW2d 528 (2000), or where "the causal connection" between the police misconduct and the discovery of the evidence "is remote or when the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *People v Frazier*, 478 Mich 231, 253; 733 NW2d 713 (2007) (quotation marks and citation omitted).

"Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions." *People v Borchard-Ruhland*, 460 Mich 278, 293-294; 597 NW2d 1 (1999). A police officer may conduct an investigatory stop and brief detention of a person if the officer has reasonable suspicion that a crime is in progress or has been committed. *Terry v Ohio*, 392 US 1, 21-22, 30-31; 88 S Ct 1868; 20 L Ed

---

[3] The Fourth Amendment applies to the states through operation of the Fourteenth Amendment. *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). See also Const 1963, art 1, § 11.

2d 889 (1968). "Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996). A police officer may arrest a suspect without a warrant if the officer has reasonable, or probable, cause to believe that a felony has been committed and that the suspect committed the felony. MCL 764.15; *People v Thomas*, 191 Mich App 576, 579; 478 NW2d 712 (1991). "Probable cause to arrest exists if the facts available to the officer at the moment of arrest would justify a fair-minded person of average intelligence to believe that the suspected person has committed a felony." *Id.*

"If an investigative stop of an automobile is proper, the officer is permitted to briefly detain the vehicle and make reasonable inquiries aimed at confirming or dispelling his suspicions." *People v Rizzo*, 243 Mich App 151, 156; 622 NW2d 319 (2000) (internal quotation marks and citation omitted). But any further detention or unconsented search must be based on probable cause. *People v Burrell*, 417 Mich 439, 456; 339 NW2d 403 (1983).

In this case, defendant on appeal argues both that the police did not have reasonable suspicion for stopping him in the first place, and alternatively, that the police did not have probable cause to progress from a *Terry* stop to arrest. In delivering its findings and conclusions, the trial court offered no separate analysis concerning reasonable suspicion for the stop and probable cause for the warrantless arrest. We agree that the evidence offered no basis for making such a distinction, given that the police forcibly stopped the car defendant was driving in the middle of the street, and immediately produced their service weapons and arrested him. Defendant was thus never subjected to a brief detention for questioning, but rather immediately seized. See *People v Freeman*, 413 Mich 492, 494-495; 320 NW2d 878 (1982) (the defendant "was 'seized' within the meaning of the Fourth Amendment when the police officers asked him to leave his automobile"). The trial court thus properly eschewed endeavoring to parse police conduct requiring only reasonable suspicion from that requiring probable cause.

We further conclude that the testimony credited by the trial court indicated that the police had sufficient legal justifications for the stop and arrest. Several eyewitnesses described a compact, light-colored car, and one suggested a likely rental unit with out-of-state plates, all of which comported with the vehicle that the police found within a few miles of the shooting the next morning in response to an anonymous tip. Defendant takes exception to the reliance by the police on an anonymous tip, and cites cases that stand for the proposition that anonymous tips, standing alone, are a poor basis for establishing probable cause. But the anonymous tip in this case was hardly standing alone, in that it offered a description of a car substantially matching the descriptions from several eyewitnesses of the one involved in the shooting, and also the car depicted in the surveillance video.

Defendant further protests that the anonymous tip included no information regarding the appearance of any person involved in the incident. But defendant identifies no police officer involved in the arrest who testified that he had relied on such information from the anonymous tip as a basis for arresting defendant. Further, if the descriptions of the shooter's appearance that were available to the police neither comported perfectly with each other, nor included any distinctive features, they nonetheless comported well enough with defendant's actual appearance as he entered and drove the rental car that it tended to confirm the police officers' suspicions that

they had the correct vehicle in view, and to provide a basis for acting on the obvious suspicion that the person responsible for the rental of the vehicle may have been involved in the shooting.

Defendant points out that merely driving the car suspected in the shooting does not in itself prove participation in that incident, but the police did not need solid proof but only mere probable cause. That it is possible to think of scenarios whereby the driver of a rented car, that was involved in a serious episode of violent criminal activity that took place the day before, himself had no involvement with that criminal activity, does not invalidate the obvious suspicion that the person exercising dominion over the car was also involved in the crime.

Defendant makes much of a police officer having heard from the prosecution's main witness that the shooter was clean-shaven, in contrast to defendant's display of substantial facial hair when arrested. However, that police officer explained that discrepancy in stating that "[h]is facial hair kind of grew on a side, not like a full beard . . . more like on the cheekbone and down," such that "if you looked at him face on you wouldn't typically say he had a beard but if he turned you could actually see." Defendant further points out that another officer who interviewed the main witness was told of a light-skinned black man, but himself thought defendant of medium darkness, but that discrepancy similarly presents not necessarily a conflict, but rather a minor difference of a sort readily attributable to different perspectives. Similarly, that still another officer recounted that the main prosecution witness described the shooter as "like . . . medium complected [sic]" might indicate that that officer did not think the distinction between medium and light degrees of darkness was an important one, or that the eyewitness himself thought so and thus offered each of those slightly varied descriptions.

For these reasons, we conclude that the reasons leading the police to suspect that the vehicle to which the anonymous tip led them was the one involved in the shooting, combined with defendant's exercise of dominion over the vehicle while presenting an appearance fairly comporting with the descriptions of a young black man of medium complexion, provided the police with reasonable suspicion for stopping the vehicle, and probable cause to arrest defendant.

## B. ATTENUATION OR INEVITABLE DISCOVERY

As noted earlier, after the police arrested defendant, they discovered that there was an outstanding Louisiana arrest warrant for him, and defense counsel, upon learning of that development, abandoned his pretrial argument for suppression, with the trial court stating on the record that it would have denied the motion regardless. We agree with the trial court that the existence of the outstanding warrant, and also defendant's lack of a driver's license, provided the police with independent reasons for persisting with defendant's arrest and the searches that followed, even if the police were hasty in concluding that they had probable cause in the first instance to arrest defendant on suspicion of murder.

The inevitable discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v Strieff*, ___US___, ___; 136 S Ct 2056, 2061; 195 L Ed 2d 400 (2016). Under the related doctrine of attenuation, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected

by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.* at ___; 136 S Ct at 206 (citation omitted).

In *Strieff*, the United States Supreme Court held that evidence seized as the result of a police officer's "mistaken" decision to effect a traffic stop "was admissible because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant." *Id.* at ___; 136 S Ct at 2063. The Court elaborated as follows:

> Although the illegal stop was close in time to [the suspect's] arrest, that consideration is outweighed by two factors supporting the State. The outstanding arrest warrant for [the suspect's] arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling [the police officer] to arrest [the suspect]. And, it is especially significant that there is no evidence that [the officer's] illegal stop reflected flagrantly unlawful police misconduct. [*Id.*]

The state conceded that the arresting officer lacked reasonable suspicion for the initial traffic stop, and so the Court assumed that position without deciding it, *id.* at ___; 136 S Ct at 2062, but did conclude that the officer "was at most negligent" in the matter, *id.* at ___; 136 S Ct at 2063.

This Court anticipated *Strieff* in *People v Reese*, 281 Mich App 290, 296-297; 761 NW2d 405 (2008), where it held that suppression was not required in connection with a search incident to an improper arrest for loitering where the police learned of a preexisting arrest warrant after the initial arrest but before the search that turned up the contraband. This Court recognized that the inquiry into the relationship between the improper arrest and evidence seized involved more than "but for" causation, and instead concerned "[w]hether the evidence was discovered through exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 295-296 (citation omitted). This Court identified as the major considerations "(1) what evidence did the police obtain from the initial illegal stop *before* they discovered the outstanding arrest warrant, and (2) whether that initial illegal stop was a manifestation of flagrant police misconduct . . . ." *Id.* at 304 (quotation marks and citation omitted). See also *Strieff*, ___ US at ___; 136 S Ct at 2062 (specifying the temporal proximity between the improper conduct and the discovery of evidence, the intervening circumstances, and the purpose or extent of the official misconduct).

In this case, although defendant was stopped and immediately arrested before his outstanding Louisiana warrant was discovered, one of the arresting officers testified that he learned of the outstanding warrant upon his return to the police station after the arrest, thus before the police discovered incriminating evidence from executing search warrants on defendant's car and home. Accordingly, to the extent that the police erred in arresting defendant on a level of suspicion short of probable cause, the outstanding warrant removed any taint in connection with the evidence they found by providing an independent basis for keeping defendant under arrest. *Strieff*, ___ US at ___; 136 S Ct at 2059-2060; *Reese*, 281 Mich App 296-297.

Further, because we have concluded that the police in fact had probable cause to arrest defendant as they did in connection with the shooting, we alternatively hold that, even if we took the contrary view, we would have concluded that the police, in arresting defendant on something short of probable cause, were not exhibiting egregious misconduct, but rather, at worst, a degree of hastiness akin to ordinary negligence, which also militates against suppression. See *Strieff*, ___ US at ___; 136 S Ct at 2063; *Reese*, 281 Mich App at 304.

For these reasons, the trial court erred neither in admitting the evidence obtained in the challenged searches, nor in concluding that defense counsel was not ineffective for having abandoned the suppression motion below. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (declining to raise a futile objection, or otherwise advance a meritless position, does not constitute ineffective assistance of counsel).

## III. CELL-PHONE TOWER RECORDS

Defendant argues that he is entitled to a new trial because the records relating to his cell phone usage for purposes of identifying what cell phone towers his phone interacted with at the time relevant were obtained without a search warrant.

Defendant acknowledges both that defense counsel expressly declined to raise any such objection below, and did so consistent with then prevailing caselaw, according to which information made available to third parties engendered no expectation of privacy for purposes of Fourth Amendment protections. See *People v Gadomski*, 274 Mich App 174, 179; 731 NW2d 466 (2007), citing *United States v Miller*, 425 US 435, 443; 96 S Ct 1619; 48 L Ed 2d 71 (1976). See also, *Smith v Maryland*, 442 US 735, 742-745; 99 S Ct 2577; 61 L Ed 2d 220 (1979). Defendant further acknowledges that the police obtained the challenged records on a showing of "reasonable grounds" in accord with the federal stored communications act,[4] see 18 USC 2703(d).

Defendant also, in his brief on appeal, correctly foresaw that the United States Supreme Court would tighten the requirements for obtaining cell-site location information (CSLI) in a decision issued while this appeal was pending. See *Carpenter v United States*, ___ US ___; 138 S Ct 2206; 201 L Ed 2d 507 (2018). In *Carpenter*, the United States Supreme Court reiterated its recognition of " 'the immense storage capacity' of modern cell phones in holding that police officers must generally obtain a warrant before searching the contents of a phone." ___ US at ___; 138 S Ct at 2214, quoting *Riley v California*, 573 US 373, 375; 134 S Ct 2473; 189 L Ed 2d 430 (2014). The Court extended that recognition to hold that acquisition of a defendant's CSLI is a search for purposes of the Fourth Amendment, and thus, that "the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Carpenter*, ___ US at ___; 138 S Ct at 2221. The concern in that case was that "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts." *Id.* at ___; 138 S Ct at 2217.

---

[4] 18 USC 2701 *et seq.*

Notably, however, in *United States v Carpenter*, 926 F3d 313, 318 (CA 6, 2019), the Sixth Circuit determined (on remand from the Supreme Court) that suppression of the CSLI was not required because the agents relied in good faith on the Stored Communications Act when they obtained the data. This holding is logical, given that the exclusionary rule hardly serves its purpose of deterring police misconduct, see *People v Goldston*, 470 Mich 523, 526; 682 NW2d 479 (2004), if applied to conduct that conformed to constitutional standards prevailing at the time. See, e.g. *Davis v United States*, 564 US 229, 231; 131 S Ct 2419; 180 L Ed 2d 285 (2011) (extending the good-faith exception to the exclusionary rule to situations in which "the police conduct a search in compliance with binding precedent that is later overruled"). We likewise find that the police acted in good faith in obtaining defendant's CSLI at the time they did. As a result, defendant is not entitled to a new trial.

## IV. INSTRUCTION ON AIDING AND ABETTING

Defendant argues that he was denied a fair trial when the trial court instructed the jury on aiding and abetting, or, alternatively, that defense counsel was ineffective for failing to raise objections to the instruction. We disagree.

Jury instructions that involve questions of law are reviewed de novo, but a trial court's determination whether an instruction is applicable to the facts of the case is reviewed for an abuse of discretion. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006). However, unpreserved instructional issues are reviewed for plain error affecting substantial rights. See *People v Knapp*, 244 Mich App 361, 375; 624 NW2d 227 (2001).

A criminal defendant has a right to have a properly instructed jury. See MCL 768.29; *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). Jury instructions must cover each element of each offense charged, along with all material issues, defenses, and theories that have evidentiary support. *People v Daniel*, 207 Mich App 47, 53; 523 NW2d 830 (1994). Conversely, an instruction should not be given that is without evidentiary support. *People v Wess*, 235 Mich App 241, 243; 597 NW2d 215 (1999).

In this case, the trial court's instructions to the jury upon the close of proofs included the following:

> In this case the defendant is charged with committing first degree premeditated murder, felon in possession of a firearm, and two counts of felony firearm, and the lesser offense of second degree murder, or intentionally assisting someone else in committing the above offenses. Anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as an aider and abettor.

> To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the . . . alleged crime was actually committed either by the defendant or by someone else. It does not matter whether anyone else has been convicted of the crime. Second, that before or during the crime the defendant did something to assist in the commission of the crime. Third, the defendant must have intended the commission of the crime alleged or

-9-

must have known that the other person intended its commission at the time of the giving of the assistance.

It does not matter how much help, advice, or encouragement the defendant gave. However, you must decide whether the defendant intended to help another commit the crime and whether his help, advice, or encouragement actually did help, advise, or encourage the crime.

Even if the defendant knew that the alleged crime was planned or was being committed the mere fact that he was present when it was committed is not enough to prove that he assisted in committing it.

Defendant does not suggest that the trial court misstated the law of aiding and abetting. Rather, defendant argues that the evidence did not give rise to any such alternative theory of defendant's participation in the subject shooting.

The prosecution points out that the defense strategy at trial consisted mainly of trying to cast doubts on the veracity of the main prosecution witness's identification of him as the shooter, and also that the evidence indicated that there were three participants in the criminal episode at issue—the man who shot the victim with a long arm firearm, the man who detained the main witness with a handgun, and the person who drove the shooter from the scene. The main witness stated that the man who threatened him with a handgun wore a mask, but defendant did not, but another witness described the rifle-toting shooter as wearing "a black mask where you could only see the eyes", and still another was unsure about any face covering for the man pursuing the victim but "thought . . . it could have been a bandana." In addition, one witness described the man with a rifle as dressed entirely in dark colors, but another described a white shirt.

"The jury may be instructed about aiding and abetting where there is evidence that (1) more than one person was involved in committing a crime, and (2) the defendant's role in the crime may have been less than direct participation in the wrongdoing." *People v Bartlett*, 231 Mich App 139, 157; 585 NW2d 341 (1998). In this case, the evidence indicated that three persons were involved in the offense, and there was just enough inconsistency, or possible confusion, regarding the descriptions of the two armed assailants, that a juror could have believed beyond a reasonable doubt that defendant was properly identified as one of the participants, but uncertain whether defendant was the person responsible for the shooting.

The prosecuting attorney touched on an aiding and abetting theory in closing argument, stating:

The Judge will also instruct[] you as to the concept of aiding and abetting. So, the evidence in this case, pretty clear, that the defendant is the shooter. And, some of you might think well yeah he's the shooter. Others—others of you, well at least he's there, all right. And, the Judge will instruct you, anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and . . . can be convicted of that crime as an aider and abettor. So, it really doesn't matter. Some of you may think well he's the shooter, some of you may think he's the aider and abettor, there really is no

-10-

difference under the law. Aiding and abetting doesn't matter how much encouragement, could be providing the gun, being the lookout, being the driver of the car, all of that relates to aiding and abetting, but the testimony particularly from Kentral Bell and other witnesses and the investigation in this case clearly show that the defendant in fact was the shooter in this case.

The prosecuting attorney thus encouraged jurors harboring some doubts about the prosecution's theory of the case only as regarded defendant's role as the shooter to harmonize with those who were firmly convinced of that aspect, and the argument drew no defense objections.

In light of the evidence of multiple participants, and given that the eyewitnesses were not entirely consistent about the appearances of the two gunmen, any objections to argument or instructions putting forward aiding and abetting as an alternative theory of defendant's responsibility for the criminal conduct at issue would have been properly overruled. Accordingly, defense counsel's performance was not deficient for want of such meritless objection. See *Ericksen*, 288 Mich App at 201.

Affirmed.


/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ James Robert Redford