**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Jonathan Donell Rhodes, Appellant.

Appellate Case No. 2015-002605

———————

Appeal From Greenville County
John C. Hayes, III, Circuit Court Judge

———————

Unpublished Opinion No. 2019-UP-361
Heard March 14, 2018 – Filed November 6, 2019

———————

**AFFIRMED**

———————

Chief Appellate Defender Robert Michael Dudek, Appellate Defender Lara Mary Caudy, and Appellate Defender Victor R. Seeger, all of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General W. Jeffrey Young, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown and Assistant Attorney General Susannah Rawl Cole, all of Columbia; and Solicitor William Walter Wilkins, III, of Greenville, all for Respondent.

**PER CURIAM:** Jonathan Donell Rhodes appeals his convictions for two counts of murder, two counts of kidnapping, one count of first-degree burglary, and four counts of possession of a weapon during the commission of a violent crime, for which the trial court sentenced him to life imprisonment. On appeal, Rhodes argues the trial court erred by (1) denying his motion to suppress his cell phone records law enforcement obtained without a warrant and (2) admitting expert testimony concerning per call measurement data (PCMD). We affirm.

## FACTS/PROCEDURAL HISTORY

Gary and Helen Wells employed Shirley Rogers as their housekeeper. According to multiple sources, Rogers was implicated as the prime suspect in an identity theft and bank fraud investigation wherein the Wellses were the victims. At least two BB&T employees witnessed Rogers confront Helen Wells regarding the investigation and they feared for Helen's safety. The Wellses ultimately terminated Rogers's employment during the pendency of the investigation. On the morning of October 3, 2012, Rogers approached the Wellses' neighbor to express concern that "a man was down" inside the Wellses' home. The neighbor's son-in-law followed Rogers into the home and discovered the bodies of Gary and Helen Wells, who had been brutally murdered.

The ensuing investigation of the murders led the police to Rhodes. An ATM surveillance camera photographed Rogers exiting a Mini Cooper the day after the murders. The vehicle was registered to Rhodes's roommate, Richard Eric Cade, who consented to a search of the vehicle. The search produced DNA samples from both Gary and Helen Wells.

According to Cade's trial testimony, he befriended Rhodes sometime in 2007 and served as a type of mentor. Cade assisted Rhodes financially by providing money, a place to live, regular use of his vehicle, and paying for his cell phone. Cade testified Rhodes was romantically involved with Rogers. On the night of the murders, Rhodes borrowed Cade's Mini Cooper, was gone most of the night, and did not return until approximately 2:00 a.m. or 3:00 a.m. the following morning. Cade repeatedly called Rhodes and sent text messages trying to contact him, but Rhodes never responded.

Special Agent Richard Fennern testified at trial that Cade's cell phone records provided by Sprint corroborated his account of the night because his attempts to

contact Rhodes originated from a cell tower consistent with him being at home all night; Rhodes received the communications via a cell tower consistent with him being at the Wellses' residence.

After Rhodes was arrested for his involvement in the murders, he was incarcerated at the same facility as Curtis McLeod, a jailhouse informant. McLeod testified Rhodes admitted he was involved in the murders. According to McLeod, Rhodes confessed he was in a relationship with Rogers, who had stolen money from the Wellses and had an ongoing "grudge" against them. Rhodes borrowed his roommate's vehicle and picked up Rogers, went to the Wellses' house, and waited out of sight while Rogers confronted the Wellses. The encounter between Rogers and the Wellses "escalated" and a struggle ensued. Rhodes told McLeod he and Rogers forced their way into the Wellses' home, separated the two victims into different rooms, killed them, and robbed the house before leaving.

The jury ultimately found Rhodes guilty as indicted and the trial court sentenced him to life imprisonment. This appeal followed.

## ISSUES ON APPEAL

1. Did the trial court err by refusing to suppress Rhodes's cell phone records?

2. Did the trial court err by admitting expert testimony regarding PCMD?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "This [c]ourt is bound by the trial court's factual findings unless they are clearly erroneous." *Id.* "The admission or exclusion of evidence is left to the sound discretion of the trial [court], whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pittman*, 373 S.C. 527, 577, 647 S.E.2d 144, 170 (2007).

## LAW/ANALYSIS

CELL PHONE RECORDS

Rhodes argues the trial court erred by denying his motion to suppress the cell phone records law enforcement obtained without a warrant. Rhodes contends law enforcement acquired the phone records "without properly complying" with the Stored Communications Act. We disagree.

In *Carpenter v. United States*, the United States Supreme Court held that citizens enjoy a legitimate expectation of privacy in their physical location data compiled and stored by wireless carriers, otherwise known as cell-site location information (CSLI). 138 S. Ct. 2206 (2018). Therefore, the government's use of CSLI constitutes a Fourth Amendment search, which requires a search warrant supported by probable cause. *See id*. at 2221. However, we do not believe the Court's decision in *Carpenter* requires exclusion of the CSLI from evidence in the present case.

Here, investigators acquired Rhodes's phone records by requesting Sprint to voluntarily disclose them pursuant to 18 U.S.C. § 2702(c)(4), a provision of the Stored Communications Act (the Act), which allows a service provider to reveal a customer's records to law enforcement under certain circumstances. Section 2702(a)(3) of the Act mandates: "[A] provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity." 18 U.S.C. § 2702(a)(3). Section 2702(c)(4) outlines the following exception:

> A provider described in subsection (a) may divulge a record or other information pertaining to a subscriber to or customer of such service . . . to a governmental entity, if the provider, *in good faith*, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency.

18 U.S.C. § 2702(c)(4) (emphasis added). In the present case, on the request form, the investigator described the "exigency" as an ongoing investigation into a double homicide with an active suspect. Regardless of *Carpenter*'s legal effect on this particular statute, the underlying circumstances of the instant matter constitute precisely the type of situation the Supreme Court expressly excepted from the warrant requirement for collection of CSLI: "While police must get a warrant when collecting CSLI to assist in the mine-run criminal investigation, the rule we set

forth does not limit their ability to respond to an ongoing emergency." *Carpenter*, 138 S. Ct. at 2223.

Further, "when investigators 'act with an objectively "reasonable good-faith belief" that their conduct is lawful,' the exclusionary rule will not apply." *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 278 (2018) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). In *Chavez*, the Fourth Circuit Court of Appeals considered the effect of the *Carpenter* opinion on a previously-issued court order authorizing the government's acquisition of the defendant's cell phone records pursuant to section 2703 of the Act. *Id.* The Fourth Circuit held, "Objectively reasonable good faith includes 'searches conducted in reasonable reliance on subsequently invalidated statutes'" and, thus, the good-faith exception to the exclusionary rule applied to the investigator's actions. *Id.* (quoting *Davis*, 564 U.S. at 239). *See U.S. v. Carpenter*, 926 F.3d 313, 318 (6th Cir. 2019) (*Carpenter* II) ("The Government's acquisition of Carpenter's CSLI violated the Fourth Amendment. The district court nevertheless properly denied suppression because the FBI agents relied in good faith on [the Act] when they obtained the data.").

As in *Chavez*, Rhodes "cannot[] deny that investigators in this case reasonably relied on court orders and [the Act] in obtaining the cell site records"[1] as they sought Sprint's voluntary disclosure of the CSLI in October 2012, years before the Supreme Court issued its opinion in *Carpenter*. Also, we find law enforcement's request for voluntary disclosure of Rhodes's cell phone records was appropriate given the violent nature of the murders. *See U.S. v. Takai*, 943 F. Supp. 2d 1315, 1323 (D. Utah 2013) (emphasizing "the violent shooting of [a store] clerk in the face at point blank range" to support the finding of an exigent circumstance supporting voluntary disclosure). Therefore, the circuit court properly admitted the CSLI placing Rhodes's phone within the general vicinity of the murders.

EXPERT TESTIMONY

Rhodes argues the trial court erred by admitting Special Agent Fennern's expert testimony regarding per call measurement data (PCMD) because the underlying science was unreliable.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

---

[1] *Chavez*, 894 F.3d at 608.

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. "[T]he trial courts of this state have a gatekeeping role with respect to all evidence sought to be admitted under Rule 702, whether the evidence is scientific or nonscientific." *State v. White*, 382 S.C. 265, 274, 676 S.E.2d 684, 689 (2009).

> When admitting scientific evidence under Rule 702, SCRE, the trial [court] must find the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable. The trial [court] should apply the *Jones* factors to determine reliability.[2] Further, if the evidence is admissible under Rule 702, SCRE, the trial [court] should determine if its probative value is outweighed by its prejudicial effect. Once the evidence is admitted under these standards, the jury may give it such weight as it deems appropriate.

*State v. Council*, 335 S.C. 1, 20-21, 515 S.E.2d 508, 518 (1999).

> In considering the admissibility of scientific evidence under the *Jones* standard, the [c]ourt looks at several factors, including: (1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures.

*Id.* at 19, 515 S.E.2d at 517.

While we agree with Appellant that the State presented insufficient evidence of the reliability of the science underlying PCMD,[3] we are convinced the error was harmless beyond a reasonable doubt in light of the more general CSLI placing Rhodes's phone within the general vicinity of the murders and the additional evidence of Rhodes's guilt. See *State v. Simmons*, 423 S.C. 552, 566, 816 S.E.2d

---

[2] *State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979).
[3] Specifically, the State fell short of establishing adequate publication and peer review of the technique and consistency of this technique with recognized scientific laws and procedures.

566, 573 (2018) ("A harmless error analysis is contextual and specific to the circumstances of the case." (quoting *State v. Byers*, 392 S.C. 438, 447, 447-8, 710 S.E.2d 55, 60 (2011))); *id.* ("No definite rule of law governs [a finding of harmless error]; rather the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it could not reasonably have affected the result of the trial." (alteration in original) (quoting *Byers*, 392 S.C. at 447-8, 710 S.E.2d at 60)); *id.* ("If a review of the entire record does not establish that the error was harmless beyond a reasonable doubt, then the conviction shall be reversed."); *State v. Adams*, 354 S.C. 361, 381, 580 S.E.2d 785, 795 (Ct. App. 2003) ("[A]n insubstantial error not affecting the result of the trial is harmless where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached.'" (quoting *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989)), *cert. denied*, (2004).

In particular, police were conducting an ongoing fraud investigation against Rogers when they discovered from her phone records that she had repeated contact with a phone number registered to Cade around the time of the murders. Investigators learned that Rhodes had been using Cade's phone. Additionally, Cade testified that on the night of the murders, Rhodes was gone all night with Cade's car, did not answer or return Cade's calls or text messages, and later told Cade at least three different stories concerning his whereabouts on that night. Cade also confirmed that there was a romantic relationship between Rhodes and Rogers.

Moreover, investigators discovered blood from both victims in Cade's vehicle, and on the morning after the murders, a TD Bank ATM surveillance camera captured Rogers exiting the vehicle. Finally, Curtis McLeod, who met Rhodes in April 2015 while they were both incarcerated in the same facility, testified that Rhodes confessed to his involvement in the murders. McLeod stated that he was not promised any benefits for testifying and had no knowledge of the crimes except what Rhodes had told him. Notably, McLeod recalled information unlikely to be known without Rhodes's confession. McLeod noted that (1) Rhodes and Rogers used a .32 caliber handgun, which is the caliber of a bullet discovered at the scene; (2) only the "female victim" was shot, which was corroborated by the pathologist; (3) the victims were separated into different rooms, which is how they were discovered; and (4) Rhodes's roommate, "Richard or something," needed his car back so he could go to work the next morning, which was confirmed by Cade's testimony.

**CONCLUSION**

Based on the foregoing, Rhodes's convictions are

**AFFIRMED.**

**HUFF, GEATHERS, and MCDONALD, J.J., concur.**